SILVEY *v.* STEELE.

5-662                                          278 S. W. 2d 662

Opinion delivered May 9, 1955.

*Keith & Clegg* and *Wright, Harrison, Lindsey & Upton,* for appellant.

*Denman & Denman,* for appellee.

WARD, J. Appellant instituted this action in chancery court asking to be adjudged the owner of an undi-

vided one-third interest in certain oil and gas holdings which were claimed and held by Charles F. Steele and Amos T. Hutchinson, and asking the trial court to declare that Steele and Hutchinson in fact held one-third of said oil and gas holdings in trust for him. Appellant based his action on an alleged oral agreement between him and Steele whereby appellant was to secure certain correction deeds and certain mineral leases and Steele was to give him the said one-third interest. Steele, emphatically denying any such oral agreement, admits that appellant did considerable work of the nature above stated for him and Hutchinson but contends that he and Hutchinson have fully paid appellant for all such work.

The trial court held that the testimony was inadequate to support appellant's claim, and the essential question presented to this court concerns the weight and sufficiency of the evidence.

*Preliminary statement.* Since the testimony is voluminous and the varied activities of the parties were somewhat complicated, yet have a potential significance to the stated issue, it will be helpful to give a general background picture.

The oil and gas holdings of which appellant seeks an undivided one-third interest pertain to only 22 acres of land, but the bulk of the work which he did in securing leases and correction deeds affected the entire 116½ acres.

In Section 8, Township 15 South, Range 22 West, there is a tract of land consisting of 116½ acres known as the "Milwee Estate." For convenient reference this tract of land is divided in this manner: 1. 70 acres consist of the East Half of the SE¼ of the SW¼ less 10 acres squarely off of the north side thereof; 2. 5 acres consist of the East Half of the 10 acres excepted above; 3. 5 acres consist of the West Half of the 10 acres excepted above; 4. 17 acres join the two 5 acre tracts on the north and is in the shape of a parallelogram. This tract may also be described as all of the South Half of

the SE¼ of the NW¼ except 3 acres squarely off the north side thereof; 5. 19½ acres lie west of the 70 acre tract and the West 5 acre tract.

It appears that Charles F. Steele and Amos T. Hutchinson are associated in the oil and gas business and have been for about 10 years prior to this litigation. For the purpose of this opinion it is not necessary to refer to appellee, Minnette Hutchinson, hereafter. She is the wife of Amos T. Hutchinson and was made a party because she had some interest in the leases, nor is it necessary to refer to Berry Asphalt Company which was made a party, because its interest will not be affected by the outcome of this litigation. Mr. Hutchinson is a non-resident and apparently is counted on to furnish the money for drilling and leasing operations. Appellee Steele apparently is a man of small financial means who has vast knowledge and experience in the oil and gas business. He is advanced in years and was in very poor health during the whole period with which we are concerned here. Apparently it was his job to do the ground work for Hutchinson. He stated on one occasion that he wrote two letters a week to Hutchinson over a period of 5 years. Appellant Silvey is a resident of Arkansas, of good reputation and apparently has had experience in dealing with other people in securing oil and gas leases. The land covered by the oil and gas leases involved in this litigation consists of the 17 acre tract and the West 5 acre tract.

On January 1, 1952, appellees Steele and Hutchinson owned, or thought they owned, all of the oil and gas leases on the disputed lands except a 1/45 interest which was later secured by Silvey. They also had oil and gas leases amounting to a considerable interest in all of the 116½ acres. It developed that it was necessary to obtain certain correction deeds and to obtain certain oil and gas interests before it would be practical to drill on any of the land. Since Steele was physically unable to do this work he enlisted the help of Silvey. Silvey says he and Steele had two separate and distinct agreements, and,

for the purpose of this opinion, we will treat them as such.

*First agreement.* There is not much if any dispute concerning the first agreement. On or about January 1, 1952, it appeared to Steele that a reasonable amount of work would clear up the lease situation and he had an agreement with Silvey to do this work for him. After some disagreement it was finally decided that Silvey should receive for his work a 1/96 (of 7/8) interest covering the entire 116½ acres. Silvey completed this work within 3 or 4 months and he was given an assignment of a 1/96 interest covering all lands. Silvey has this interest and is now drawing remuneration as a result of wells having since been drilled.

*Second agreement.* Apparently during the time that Silvey was working under his so-called first agreement the abstract of title to the "Milwee Estate" was being examined by Mr. Steele's attorney, Charles H. Tompkins. As a result of this title examination Mr. Tompkins discovered that certain correction deeds would have to be obtained to perfect the title to the lands, and that there was a large amount of so-called splinter leases or interests outstanding on the lands. It was recognized that the work required by the attorney must be done before it would be practical to start drilling operations, and it was also apparent that it would necessitate considerable work on the part of someone to meet the attorney's requirements. This information was made known to Steele about the time that Silvey had completed his work under the first agreement. It is not disputed that Steele [and Hutchinson] desired and expected Silvey to do this work. The terms of the agreement under which Silvey undertook and did the required work are in dispute and form the basis of this lawsuit. Silvey has one version of the understanding or agreement and Steele has an entirely different version.

*Silvey's understanding of the agreement.* Generally speaking Silvey contends that he had a definite oral agreement with Steele to do the work required by Mr.

Tompkins whereby he, Steele, and Hutchinson would all be equal partners in all of the leases covering the entire 116½ acres of land, or, in other words, that he, Silvey, would receive for his work one-third of the oil and gas leases on all of the "Milwee Estate." It is not disputed that Silvey worked many months in accomplishing the work he did or that he did a good job. The record shows that Steele and Hutchinson have assigned to Silvey a one-third interest in the 70 acre tract and the 19½ acre tract. This suit is an effort by Silvey to obtain a one-third interest in the 22 acre tract. It should be stated here that the East 5 acre tract is not involved in this suit. Silvey admits that Steele had begun drilling a well on the East 5 acre tract before he performed his first agreement and that he at no time claimed any interest in that tract. Actually then, Silvey only claimed as to 111½ acres.

*Appellees' understanding of the agreement.* Again generally speaking, Steele denies emphatically that he made the agreement alleged by Silvey, and states that the understanding which he had with Silvey was substantially as follows: At no time did he agree to give Silvey a one-third interest in the 22 acre tract because, as he says, he already had that land under lease and did not contemplate much difficulty in clearing the title and lease situation as to that land. He admits that Silvey wanted an additional interest to compensate him for the extra work required by Tompkins and that consequently he (Steele) promised and did give him a one-third interest in the 70 acre tract and also the 19½ acre tract.

There are certain facts and circumstances disclosed by the record which each side points to as indicating substantiation for each respective contention.

*Appellant points out.* (a) Since work under the first agreement had been completed and he had been paid therefor by the assignment of a 1/96 interest in all of the "Milwee Estate" lands, appellant says that it is unreasonable to suppose that he would undertake and

perform the enormous amount of work required by Tompkins without requiring a one-third interest in the leases covered on all of the lands, and that it is significant that much of the work performed by him related to the 22 acres in question. Many of the leases which he obtained from the Milwee heirs included the said 22 acres as well as the 89½ acres.

(b) On January 19, 1953, Tompkins wrote a letter to Steele, enclosing a certain assignment covering the 19½ acre tract, in which he indicated it was his understanding that Silvey owned an undivided one-third of the leasehold interest in the "Milwee Estate" lands. It is significant, appellant says, that appellees, having thus been put on notice of Silvey's claim, made no protest at the time or at any time thereafter, and that it is also significant that Steele did not remember receiving this letter.

(c) Appellant says that Steele claims that he did not agree to give appellant a one-third interest in any of the lands until July, 1953. Therefore, says appellant, Steele's testimony cannot be reconciled because the letter just referred to above indicates that Steele must have known about appellant's claim of a one-third interest as early as January 19, 1953.

(d) A large number of the leases secured by Silvey were taken in his name—later assigned to appellees.

*Appellees point out.* (a) Appellees acquired the original leases on the "Milwee Estate" and had to a large degree secured all leases on the 22 acres before Silvey entered the picture. Appellee Hutchinson was looked to as the man to furnish the money to pay for leases, attorney fees and operational expenses, and Steele states that he paid $1,700.00 to keep liens from running against the leases so that Hollyfield-Warren could drill a well on the 70 acres.

(b) All parties including Silvey knew that the 22 acre tract was the most valuable and Silvey admits that on one occasion appellees refused to give him any interest in the 17 acre tract.

(c)   While it is true that Silvey took leases in his name Steele gave him instructions not to do so and in any event the leases were assigned by Silvey to appellees.

(d)   Silvey admits he knew that appellees assigned certain leases for the drilling of a well on the 17 acre tract and that he did not make any claim for his one-third interest at the time.

(e)   Mr. Tompkins stated that he did not know what the trade was between Silvey and appellees and that it was none of his business, although he knew they had some kind of an agreement.

(f)   Several letters written by Steele to Hutchinson were introduced in evidence which, appellant agrees, are competent.   These letters indicate Steele was unwilling to let Silvey have any interest in the disputed lands on January 10, 1952; January 20, 1952, Silvey was not satisfied, and Steele said ''to stop where he was if he was not satisfied,'' but Silvey said he would go on through with it; January 31, 1952, Steele said that he was sorry that he hired Silvey to get leases on the 70 acre tract and the 19½ acre tract and that Silvey wanted to buy an interest in the 22 acres because he realized ''this is the high point,'' but Steele refused; on March 10, 1952, Steele wrote that Silvey ''is never satisfied with what he is getting—I pay no attention to him any more.''

(g)   On one occasion after appellant claims the second agreement was made Steele and Silvey were present when Hollyfield-Warren were attempting to locate a well just south of the East 5 acres and Fred Forest, a witness for appellees, was asked, ''Q. Did you hear any discussion between Mr. Silvey and Mr. Steele as to ownership of two tracts, North tract and South tract?'' He answered, ''I heard Mr. Silvey say it did not make any difference and Mr. Steele said 'Yes it does, I am not going to have that that close.'   This is mine and that is yours and we are not going to drain my oil with that.''

(h) Raney Ellis, age 82, a witness for appellees, stated that he was at Mr. Steele's home in July of 1953 when Silvey was there, and he heard Steele promise Silvey one-third interest in the 70 acres and one-third interest in the 19½ acres. Witness stated that Silvey was well pleased.

(i) Billy D. Stroups, a witness for appellees, stated that he lived with Mr. Steele during the first two or three months of 1953 and during July and August of 1953; he was in Mr. Steele's house on the occasion mentioned by Raney Ellis and he heard Silvey and Steele talking; that Silvey indicated he didn't think he was getting enough for his work; that Steele gave him a 1/96 of the ''Milwee Estate'' land; but that he didn't hear Steele say anything to Silvey about a one-third interest.

It can be readily seen from the above that much of the testimony is in hopeless conflict and much of it lacks clarity. One difficulty in trying to determine exactly which view the record substantiates is that most of the facts and circumstances relative to the dealings between Silvey and Steele are consistent with Silvey's understanding of the agreement and also consistent with Steele's understanding. On the one hand it seems probable that since Steele and Hutchinson had been working together for so many years, they would not readily take a third party into full partnership. It is equally understandable, and the record shows, that Silvey desired to have a one-third interest in all of the lands, and it is not denied that he did a difficult job well. On the other hand the record shows that Silvey is now receiving, as a result of his work, something like $500.00 a month and it appears likely he may receive more in the future. It is recognized, of course, as stated by the chancellor, that we are not here concerned with the amount of work done by Silvey except in so far as it may shed light on the agreement. Perhaps one of the most significant circumstances tending to corroborate Silvey and to discredit appellees' testimony generally, is the letter written by Tompkins on January 19, 1953, in which he, to some extent, put Steele on notice that Silvey was claiming a

one-third interest in all of the land, and which suggests the one-third interest had been discussed at that time. On the other hand it must be recognized that this does not constitute substantive testimony that Steele consented to such an arrangement. Tompkins admits that he didn't know what the agreement was between Silvey and Steele and it will be presumed that he got his information regarding the matter from Silvey, which of course could not bind Steele. It is possible also that Steele, having read the letter, concluded that it did not necessitate a positive denial on his part. Moreover we are not sure that Steele fixes July 1953 as the first time a one-third interest for Silvey was mentioned. One time Steele did fix this date, but at another time he said it was July 1952—it's possible the first statement was inadvertently made. It is noted also that appellant says the date cannot be determined, and the fact that one witness heard the conversation [about the agreement in 1953] does not necessarily preclude previous conversations of a similar nature.

We are impressed with the exhaustive and apparently conscientious effort put forth by the chancellor, reflected in a lengthy and comprehensive written statement, to arrive at a just determination. It was his opinion that the testimony failed to meet the burden imposed by law upon Silvey to prove he had an agreement with Steele to receive a one-third interest in the leases covering all the lands.

After a careful consideration of all of the testimony we cannot say that the conclusion reached by the chancellor is against the weight of the testimony, and therefore the decree of the trial court is sustained.

SEAMSTER, C. J., not participating.